**David Bradley ASHCRAFT, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 10–95–206–CR.

Court of Appeals of Texas, Waco.

March 20, 1996.

Discretionary Review Refused May 22, 1996.

**650**

Shelly D. Fowler, Cleburne, for appellant.

Dale S. Hanna, District Attorney, David W. Vernon, Asst. District Attorney, Cleburne, for appellee.

Before CUMMINGS and VANCE, JJ.

## OPINION

VANCE, Justice.

David Bradley Ashcraft, the appellant, was charged by indictment with two counts of aggravated sexual assault of a child and one count of indecency with a child. TEX.PENAL CODE ANN. §§ 21.11(a)(1), 22.021(a)(1)(B)(i) (Vernon 1994). The indictment was based upon allegations from K.A., Ashcraft's twelve-year-old daughter, that Ashcraft had sexually assaulted her on two separate occasions. He pled not guilty to all three counts, and a jury convicted him as charged. The jury assessed punishment at thirty years in prison for the two counts of aggravated sexual assault of a child and twenty years in prison for the indecency count.

Ashcraft appeals on two points. He first complains that the court erred by denying his motion for new trial, which was based on the newly discovered evidence that K.A. recanted her allegations against him. His second complaint is that the court erred by admitting a photograph of K.A.'s genitalia because the prejudicial effect of the photograph outweighed its probative value. Because we find that the record supports the court's finding that K.A.'s recanting testimony was false and that the photograph at issue did not present a danger of unfair prejudice that substantially outweighed its probative value, we conclude that the court did not abuse its discretion. We will affirm the judgment.

### COMPLAINANT'S TESTIMONY AT TRIAL

K.A. testified at trial on March 28, 1995, that Ashcraft sexually assaulted her on two separate occasions: once in April 1994, and once in June 1994.

#### APRIL 1994 ASSAULT

According to the record, K.A.'s mother took a trip out of state sometime in April 1994. As a result, K.A. was alone with her father and her three sisters overnight. After her three sisters were in their own beds, Ashcraft told K.A. to go sleep in his bed "because it was cold." K.A. related that the

following events occurred when Ashcraft joined her in his bed:

[PROSECUTOR]: What happened?

[K.A.]: He asked me if I wanted to play around. I thought he was joking around so I said, "Yeah." And he told me to take my underwear off and I did. And he put his privates inside of me.

[PROSECUTOR]: When you talk about "privates", tell the jury what you mean by that?

[K.A.]: His penis inside of me.

[PROSECUTOR]: So he told you to take your underwear off; is that correct?

[K.A.]: Yes, sir.

[PROSECUTOR]: Did you do that?

[K.A.]: Yes, sir.

[PROSECUTOR]: And what did he do?

[K.A.]: He put his penis inside of me.

[PROSECUTOR]: How did you feel?

[K.A.]: I was really scared.

[PROSECUTOR]: Did it hurt?

[K.A.]: Yes, sir.

[PROSECUTOR]: Did he touch you anywhere else or anything?

[K.A.]: He touched me on my private. And he started kissing my breasts.

[PROSECUTOR]: Do you remember how long he had his private inside of you?

[K.A.]: For a few seconds.

. . . . .

[PROSECUTOR]: Okay. Then what happened?

[K.A.]: And then he told me to put my underwear back on and I did. And then we went to sleep.

[PROSECUTOR]: What happened the next morning?

[K.A.]: He made breakfast for me and my sisters, and we ate. He told me to help him make his bed. While I was helping

make his bed he told me not to tell nobody.

JUNE 1994 ASSAULT

The record indicates that K.A.'s mother took another trip out of state sometime in June of 1994. One of K.A.'s sister's accompanied K.A.'s mother on this trip, leaving K.A. alone with her father and her other two sisters. As K.A. lay sleeping in her own bed, Ashcraft woke her up by tickling her and told her to go sleep in his bedroom. K.A. testified that the following events occurred when Ashcraft joined her in his bed:

[PROSECUTOR]: What happened?

[K.A.]: And then, and then after that, he asked me if I wanted to play around again. And I was scared to say no, so I said, "Yeah." And he told me to take my underwear off. And then he put his private inside of me again.

. . . . .

[PROSECUTOR]: And did it hurt again?

[K.A.]: Yes, sir.

[PROSECUTOR]: How long was his private part inside of you?

[K.A.]: About a couple of seconds.[1]

[PROSECUTOR]: What happened then?

[K.A.]: And then he had me touch his private.

[PROSECUTOR]: How did that happen?

[K.A.]: He took my hand and put it on his private.

[PROSECUTOR]: Did you want to do that?

[K.A.]: No, sir.

[PROSECUTOR]: How did that come about? He took your hand?

[K.A.]: Yes, sir.

[PROSECUTOR]: And he put it on his private?

[K.A.]: Yes, sir.

[PROSECUTOR]: Did he say anything?

[K.A.]: And then I kept taking it away. He told me it didn't bite.

. . . . .

[DEFENSE]: What happened immediately after that? Did he leave them in there?

[K.A.]: He left it in there for like a few minutes or so.

---

1. K.A. later testified during cross-examination:
 [DEFENSE]: He put his privates inside of yours?
 [K.A.]: Uh-huh.

[PROSECUTOR]: And did you keep your hand on his private?

[K.A.]: No, I kept taking it off.

. . . . .

[PROSECUTOR]: What did he do?

[K.A.]: He kept putting it back on.

[PROSECUTOR]: How did you feel?

[K.A.]: I felt weird.

[PROSECUTOR]: Were you scared?

[K.A.]: Yes, sir.

[PROSECUTOR]: Did he touch you again anywhere else?

[K.A.]: Yes, sir. He touched me on my private, and he kissed me on my breasts.

[PROSECUTOR]: Kissed you on your breasts and touched you on your private with what?

[K.A.]: With his hand.

[PROSECUTOR]: Did you go to the bathroom after that?

[K.A.]: Yes, sir.

[PROSECUTOR]: Did you see anything?

[K.A.]: Something white came out when I used the restroom.

[PROSECUTOR]: Where did it come from?

[K.A.]: From my private.

## MOTION FOR NEW TRIAL

In point one, Ashcraft contends that the court erred by overruling his motion for new trial. That motion was based on the newly discovered evidence of K.A.'s recantation of her trial testimony.

### STANDARD OF REVIEW

The standard of review for the denial of a motion for new trial based on newly discovered evidence is abuse of discretion. *Lewis v. State*, 911 S.W.2d 1, 7 (Tex.Crim. App.1995); *State v. Gonzalez*, 855 S.W.2d 692, 696 (Tex.Crim.App.1993). Motions for new trial based on newly discovered evidence are not favored by the courts and are viewed with great caution. *Drew v. State*, 743 S.W.2d 207, 225–26 (Tex.Crim.App.1987). We do not substitute our judgment for that of the trial court, but rather decide whether the trial court's decision was arbitrary or unreasonable. *Id.*

### APPLICABLE LAW

A trial court's decision whether to grant a motion for new trial based on newly discovered evidence has been governed by three different sources in the last decade, depending on when the offense was committed. Prior to the adoption of the Texas Rules of Appellate Procedure, which became effective September 1, 1986, motions for new trial were governed by article 40.03(6) of the Code of Criminal Procedure, which provided in part that, "New trials, in cases of felony, shall be granted the defendant for the following causes, and for no other: ... (6) Where new evidence *material* to the defendant has been discovered since the trial." Act of May 27, 1965, 59th Leg., R.S., ch. 722, 1965 Tex.Gen. Laws 317, 476, *repealed by* Act of May 27, 1985, 69th Leg., R.S., ch. 685, § 4(b), 1985 Tex.Gen.Laws 2472, 2473 (emphasis added).

Rule of Appellate Procedure 30(b)(6), which replaced article 40.03(6) for cases in which the offense was committed on or after September 1, 1986, stated in part: "A new trial shall be granted an accused for the following reasons: ... (6) Where new evidence *favorable* to the accused has been discovered since trial." TEX.R.APP.P. 30(b)(6), 49 TEX.B.J. 564 (1986) (emphasis added). The notable difference in Rule 30(b)(6) was the change in the description of the new evidence required from "material" to "favorable." *Id.*

Finally, effective September 1, 1993, the Legislature replaced Rule 30(b)(6) with article 40.001 of the Code of Criminal Procedure, which restores the word "material." TEX. CODE CRIM.PROC.ANN. art. 40.001 (Vernon Supp.1995). Article 40.001 is effective for cases in which the offense was committed on or after September 1, 1993, and provides: "A new trial shall be granted an accused where *material* evidence *favorable* to the accused has been discovered since trial." *Id.* (emphasis added). Because all offenses at issue in the present case were allegedly committed after September 1, 1993, the trial court's decision whether to grant Ashcraft's motion for new trial based on newly discovered evi-

dence is governed by article 40.001 of the Code of Criminal Procedure. *Id.*

■ The above changes are significant because of the impact they have had on courts' decisions to grant or deny motions for new trial based on newly discovered evidence. They are also important because the Court of Criminal Appeals has not yet decided a case based on newly discovered evidence under article 40.001. *Id.* The Court's most recent decision involving a motion for new trial based on newly discovered evidence is *Moore v. State,* in which the Court was called upon to evaluate a trial court's decision to overrule an appellant's motion for new trial based on newly discovered evidence brought under Rule 30(b)(6). 882 S.W.2d 844, 849 (Tex. Crim.App.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995). In *Moore,* the Court reasoned, "Because rule 30(b)(6) contains language virtually identical to former Article 40.03(6), we shall review appellant's point of error under the same analysis." *Id.* (citation omitted). We similarly conclude that because the language of article 40.001 (*"material* evidence *favorable* to the accused") is essentially a combination of former article 40.03(6) ("new evidence *material* to the defendant") and former Rule 30(b)(6) ("new evidence *favorable* to the accused"), we should review Ashcraft's point of error under the "same analysis" the Court used to decide cases under article 40.03. *See id., see also* TEX.CODE CRIM.PROC.ANN. art. 40.001 (Vernon Supp.1995) (emphasis added); Act of May 27, 1965, 59th Leg., R.S., ch. 722, 1965 Tex.Gen.Laws 317, 476 (repealed 1985) (emphasis added); TEX.R.APP.P. 30(b)(6), 49 TEX.B.J. 564 (1986) (emphasis added).

■ Accordingly, to show that the trial court abused its discretion in not granting a new trial, the record must reflect that: (1) the newly discovered evidence was unknown to the movant at the time of trial; (2) the movant's failure to discover the evidence was not due to his want of diligence; (3) the evidence is admissible and not merely cumulative, corroborative, collateral, or impeaching; and (4) the evidence is probably true and would probably bring about a different result in another trial. *Moore,* 882 S.W.2d at 849; *Gonzalez,* 855 S.W.2d at 697 n. 1 (Mey-ers, J., concurring); *Eddlemon v. State,* 591 S.W.2d 847, 849 (Tex.Crim.App.1979).

■ The State argues that Ashcraft has failed to establish the fourth prong, *i.e.,* that the new evidence is probably true and would probably bring about a different result in another trial. *Id.* Cases in which a witness recants after trial have historically been analyzed by a unique set of rules. Thus, in cases "where a witness has testified to material inculpatory facts against an accused and after verdict, and before a motion for new trial has been acted upon, such witness makes affidavit that he testified falsely," the general rule is that the new evidence is probably true and a new trial should be granted. *See Williams v. State,* 375 S.W.2d 449, 451 (Tex.Crim.App.1964). However, this general rule is not without exception. An exception exists where the recantation is found to be incredible in light of the trial evidence. *Id.; Villarreal v. State,* 788 S.W.2d 672, 673 (Tex. App.—Corpus Christi 1990, pet. ref'd). Another exception exists where evidence is produced at the new trial hearing to show that the recantation is incredible or pressured. *Dillard v. State,* 550 S.W.2d 45, 52 (Tex. Crim.App.1977); *Villarreal,* 788 S.W.2d at 673. New evidence has been found *not* to be "probably true" when, for example, the new testimony is internally inconsistent or otherwise inherently suspect. *Jones v. State,* 711 S.W.2d 35, 37 n. 4 (Tex.Crim.App.1986); *Williams v. State,* 504 S.W.2d 477, 483 (Tex. Crim.App.1974).

■ In all "new-evidence" cases, the credibility of the witnesses and the probable truth of the new evidence is primarily a determination for the trial judge. *Etter v. State,* 679 S.W.2d 511, 515 (Tex.Crim.App. 1984); *Williams,* 504 S.W.2d at 483. The judge is well-positioned to see the witnesses, observe their demeanor, and determine their credibility. *Id.* If the newly discovered evidence is of questionable weight and credibility, and would probably not bring about a different result upon a new trial, the court does not abuse its discretion in refusing a new trial. *Jones,* 711 S.W.2d at 37; *Lyon v. State,* 885 S.W.2d 506, 518 (Tex.App.—El Paso 1994, pet. ref'd).

APPLICATION

■ Ashcraft's motion for new trial was based on the newly discovered evidence of K.A.'s recantation of her trial testimony. We do not determine K.A.'s credibility. What we have to determine is whether the trial court abused its discretion in not accepting K.A.'s new testimony as true. We review the record to determine if there is any evidence that reasonably supports the court's decision. A brief account of events is helpful in this regard.

■ K.A. first made an outcry statement on November 18, 1994, to Robin Secoy, a counselor at her school with eleven years experience. K.A. made another statement to Dr. Jan Lamb a few days later on November 23 during a medical examination. Finally, K.A. testified against Ashcraft at trial on March 28, 1995. Her allegations against him at trial were factually consistent with both of her previous statements. In addition, Dr. Lamb's physical examination of K.A. resulted in findings of a torn hymen and evidence of blunt force penetrating trauma that were consistent with her allegations of sexual abuse. Ashcraft was found guilty and sentenced on March 30, 1995.

The court designated Texas Protective and Regulatory Services as K.A.'s temporary managing conservator from the time of her outcry on November 18, 1994. Consequently, K.A. was in foster care and separated from her family for over four months until the trial on March 28, 1995, and continued to remain in foster care through the hearing on Ashcraft's motion for new trial on May 3, 1995, in which she recanted her trial testimony. The record indicates that K.A. disliked foster care and desperately wanted to rejoin her family. It also indicates that K.A.'s mother never believed her allegations and continuously pressured K.A. to change her story. Mrs. Ashcraft had significant access to K.A. after the trial, including weekend home visits. K.A.'s recantation occurred during one of these home visits.

According to the record, immediately prior to K.A.'s recantation, Mrs. Ashcraft proposed the idea of K.A. going to England with one of her sisters to live with her aunt. K.A. was under the assumption that after recanting her story, she would be free of foster care and allowed to go to England. On April 19, 1995, Mrs. Ashcraft took K.A. to the office of the defendant's attorney. K.A. did not know she was being taken there. K.A.'s cousin and aunt were also present at the office, where the defense attorney informed her that her father could have been given a life sentence for his conviction. After this initial meeting in the defense attorney's office, Mrs. Ashcraft took K.A. to the District Clerk's office where she showed her the photograph of her vagina that was used as evidence in the trial. K.A. was previously unaware of the use of the photograph and became angry and ashamed. Immediately thereafter, Mrs. Ashcraft returned K.A. to the defense attorney's office, where she gave a recanting affidavit.

At the hearing on Ashcraft's motion for new trial, K.A. testified that the reason she fabricated her original testimony was that she was mad at her father for not being there to protect her from a sexual assault by N.R., the younger brother of her baby-sitter. According to K.A., when she was four or five years old and N.R. was seven years old, N.R. "took my clothes off and put his private inside of me." According to the evidence, the only instances of sexual activity in K.A.'s life involved her allegations against N.R. and her allegations against her father. Dr. Lamb testified that, based on reasonable medical probability, it is unlikely and unreasonable to conclude that a seven-year-old-boy's penis would have the length, diameter, and hardness to cause the physical findings she observed in K.A. K.A. also offered the explanation that the reason she fabricated her original testimony was that her father made her mad by praising her sister for making good grades and scolding her for making bad grades the day before she made her first outcry to the school counselor.

Based on the evidence, the trial judge found that K.A.'s original trial testimony was true and that her recanting testimony at the hearing on Ashcraft's motion for new trial was untrue. We hold that the record supports such a finding by the trial judge and that his action in overruling Ashcraft's mo-

tion for new trial was, therefore, not an abuse of his discretion.

## FACTUAL SUFFICIENCY

 Within point one, Ashcraft relies on the Court of Criminal Appeals' decision in *Meraz v. State* to make the additional argument that we should review the trial judge's findings of fact[2] on Ashcraft's motion for new trial for factual sufficiency. 785 S.W.2d 146, 154 (Tex.Crim.App.1990). In *Meraz*, the Court held that "[t]he court of appeals is therefore constitutionally given the authority to determine if a jury finding is against the great weight and preponderance of the evidence." *Id.* In other words, courts of appeals have constitutional authority "to determine whether a jury finding on a matter the *defendant* must prove is factually insufficient." *Stone v. State*, 823 S.W.2d 375, 377 (Tex.App.—Austin 1992, pet. ref'd, untimely filed) (emphasis in original). Ashcraft argues that, because his burden of proof during the hearing to consider his motion for new trial "is not unlike the burden of proof which arises in the proving of an affirmative defense," then the trial judge's decision "is ripe for appellate review." We disagree.

 As stated above, the standard of review of the determination of a motion for new trial is abuse of discretion. *Lewis*, 911 S.W.2d at 7; *Gonzalez*, 855 S.W.2d at 696. We have previously held that we do not apply a factual sufficiency review in civil cases when the standard of review is abuse of discretion. *Thomas v. Thomas*, 895 S.W.2d 895, 896 (Tex.App.—Waco 1995, writ denied); *see also Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex.1991). By analogy, we extend our holding in *Thomas* to criminal cases and now hold that we do not apply a factual sufficiency review in criminal cases when the standard of review is abuse of discretion. *Thomas*, 895 S.W.2d at 896. We overrule point one.

## PHOTOGRAPH

In point two, Ashcraft complains that the court erred by admitting a photograph of K.A.'s genitalia because the prejudicial effect of the photograph outweighed its probative value. During its direct examination of Dr. Lamb, the State sought to introduce a color photograph depicting the severity of the tear in K.A.'s hymen, the "continuous piece of tissue that surrounds the opening of [her] vagina."

 Texas Rule of Criminal Evidence 403 provides that, although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. TEX.R.CRIM.EVID. 403. Several factors may be considered in determining whether the danger of unfair prejudice substantially outweighs the probative value of photographs, including "... the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or color, whether they are close-up, whether the body is naked or clothed [, and] ... the availability of other means of proof and the circumstances unique to each individual case." *Emery v. State*, 881 S.W.2d 702, 710 (Tex.Crim.App.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1257, 131 L.Ed.2d 137 (1995) (quoting *Long v. State*, 823 S.W.2d 259, 272 (Tex.Crim.App.1991), *cert. denied*, 505 U.S. 1224, 112 S.Ct. 3042, 120 L.Ed.2d 910 (1992)). Generally, photographs are admissible where verbal testimony about the same matters is admissible. *Hernandez v. State*, 819 S.W.2d 806, 819 (Tex.Crim.App.1991), *cert. denied*, 504 U.S. 974, 112 S.Ct. 2944, 119 L.Ed.2d 568 (1992); *Ramirez v. State*, 815 S.W.2d 636, 647 (Tex. Crim.App.1991). Ultimately, however, the admissibility of photographs over any challenge is within the sound discretion of the trial judge. *Jones v. State*, 843 S.W.2d 487, 501 (Tex.Crim.App.1992), *cert. denied*, 507 U.S. 1035, 113 S.Ct. 1858, 123 L.Ed.2d 479 (1993). *See also Narvaiz v. State*, 840

---

**2.** Rule 31(e)(2) of the Texas Rules of Appellate Procedure provides that in granting or overruling a motion for new trial, "[t]he judge shall not sum up, discuss or comment on evidence in the case." TEX.R.APP.P. 31(e)(2). To constitute error, however, the appellant must show that he suf-

fered some harm from the erroneous procedure. *Whitmore v. State*, 570 S.W.2d 889, 892 (Tex. Crim.App.1976); *Tate v. State*, 834 S.W.2d 566, 571 (Tex.App.—Houston [1st Dist.] 1992, pet. ref'd). Ashcraft neither alleges nor demonstrates harm.

S.W.2d 415, 429 (Tex.Crim.App.1992), *cert. denied*, 507 U.S. 975, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993); *Burdine v. State*, 719 S.W.2d 309, 317 (Tex.Crim.App.1986), *cert. denied*, 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987).

 The photograph of which Ashcraft complains is a single, three-inch by four-inch, color "video print" of K.A.'s hymen taken from a colposcope, a gynecological instrument used to visualize the inside of the vagina. Ashcraft does not allege any tampering, enhancement, or attempt by the State to inflame, confuse, or mislead the jury by presenting the photograph. Although graphic, it is not gruesome, and is not of the type that would horrify or shock the viewer. In fact, without an expert explanation to provide a frame of physical reference, it is difficult to tell exactly what the photograph depicts. Nothing is depicted in the photograph that was not also included in Dr. Lamb's testimony.

In response to the State's offer of admission, Ashcraft argued that the State could illustrate its point equally well without the photograph by drawing on a diagram or schematic for the jury. Dr. Lamb explained that, "in other criminal cases," she uses photographs *in conjunction* with diagrams: "It is difficult for a lay person to sort of orient, what am I looking at. So I use the photograph, and I draw on that schemem--atic [sic] and illustrate what the injuries actually are." The fact that the photograph was used in conjunction with and to explain the nature of the offense to the jury heightened the photograph's probative value. Based on its probative value and its relatively benign tendency to present a danger of unfair prejudice, we conclude that the court did not abuse its discretion in admitting the photograph. We overrule point two.

## CONCLUSION

Because we find that the court did not abuse its discretion in finding that K.A.'s recanting testimony was false and in concluding that the photograph at issue did not present a danger of unfair prejudice that substantially outweighed its probative value, we affirm the judgment.