

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-19-00080-CR

TRAVON WALKER, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 5th District Court
Bowie County, Texas
Trial Court No. 18-F-0897-005

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Justice Stevens

MEMORANDUM OPINION

After a Bowie County jury found Travon Walker guilty of felony murder, he was sentenced to fifty-five years in prison and assessed a $10,000.00 fine. On appeal, Walker contends (1) that the evidence was insufficient to support the jury's guilty verdict and (2) that the trial court reversibly erred when it admitted three autopsy photographs of the victim.

Because we find (1) that there was sufficient evidence to support the verdict and (2) that the trial court did not err when it admitted the complained-of photographs, we affirm the trial court's judgment.

I.      Background

In January 2018, Chris Shavers and Marquan Neal were arguing with one another for much of the day over family issues. At some point, Neal and Shavers decided that they would physically fight each other. After determining where the fight would take place, Shavers and his cousin, Leslie Henderson, drove to the designated location and parked their vehicle. Shavers exited the vehicle and walked across a nearby field, where he joined his friends, Steve Jones and Walker. While Shavers brought his gun,[1] he testified that he did not intend to use the weapon during the fight and, therefore, gave it to Walker.[2]

When Shavers arrived, the fight between Shavers and Neal ensued. After "wrestling" and "tumbling over and over," someone broke up the fight. Shavers stated that he then heard a gunshot and started to run away from the scene, but that he did not see who fired the gun. After hearing

---

[1]Shavers testified that the gun was a 9mm Taurus that he bought from a pawn shop for around $220.00.

[2]Shavers said that he usually carried a gun. Even so, Shavers testified that, on the day of the incident, he did not shoot the gun, fire it up in the air, or shoot it toward anybody.

2

the initial shot, Shavers said he heard more firing, but he still did not see who was firing the gun. According to Shavers, he did not retrieve his gun from Walker immediately following the incident.

When he later returned to the scene, Shavers saw an ambulance, so he went to a local hospital "[t]o see what was going on." There were several other individuals at the hospital that Shavers knew, including Walker, Henderson, and Steve Jones. At that time, Shavers learned that Walker's wife, Kaitlin Lee, had been shot. Shavers said that, other than the information Walker had given him, he knew no details about the shooting. He did not ask Walker if he was the person who shot Lee, and Walker did not volunteer the information. After leaving the hospital, Shavers's sister Brandi took him to Walker's girlfriend's apartment so he could retrieve his gun.

Latrilla Brown was also present during the incident. Latrilla stated that she saw Shavers and Neal fighting and that she saw Shavers give Walker the gun. Latrilla also saw Walker fire the gun once into the air. After Latrilla heard the initial shot, and while running away from the area, she heard additional shots. According to Latrilla, she heard several shots fired about two to three minutes after she saw Walker fire the gun into the air, but she did not know who fired the additional shots.

Neal's cousin, Calvin Davis, was also among the individuals present at the scene. Despite first telling the officers that he did not see anything that evening, Davis later told them that he did see Walker fire the gun once into the air. At trial, Davis testified that he saw Walker fire the gun into the air but did not see who fired the later shots. When Davis was asked whether he believed Walker shot in the air to stop the fight between Neal and Shavers, Davis said, "I guess so."

Flornica Brown, who lived in the area, was also present during the incident. Flornica stated that she saw Shavers and Neal fighting in her neighbor's driveway but that someone "broke the fight up." Flornica stated that she was not sure who gave the gun to Walker but that "[Walker] had the gun." Flornica also testified that she "just heard one shot" and that "[t]hat's when everybody, like, kind of like scattered off or whatever." She later clarified that she heard Walker say "get the [f---] back" and that then she saw him fire the gun up into the air. Flornica also explained that, although she did hear the subsequent shots fired, she did not know if it was Walker who had fired them.

Neal conceded that he fought with Shavers.[3] He explained that he arrived at the designated fight location before Shavers's arrival. When Shavers arrived, some of Shavers's friends were with him, including "Bug," Jones, and Walker. Neal testified that, when Shavers first walked up to him, he "pulled a gun out" but that he then gave it to Walker. According to Neal, Walker "pulled [the gun] out and . . . was like, 'Don't hit my homeboy [Shavers] like no more.'" Walker then pointed the gun directly at him. Neal responded by raising his hands, positioning himself against a mailbox, and telling "[Walker] to shoot, you know. I said, like '[s]hoot me.'" Neal said Walker pointed the gun toward the ground at that point, at which time Neal and his friends began walking away. Neal then said, "As we were walking off, my homeboy like -- the white boy I'm with, he was like, 'He finally shot[.]' It was one shot at first, it went like, pow." As to the remaining shots, Neal stated, "I looked back. I looked back. After I looked back, then I knew Walker was shooting

---

[3]Neal and Shavers each have a child with the same woman, Saquiecia Bullock. According to Neal, they had gotten into the fight that day over the children and their financial support.

4

pow, pow, pow, pow." Neal stated that he observed Walker firing the last shots and that he fired the gun toward him "like five or six, maybe four, five or six" times. When asked if Walker was shooting toward the north or the south, Neal explained that Walker had been shooting the gun toward the north.

David Bryan Jackson, who lived in the neighborhood where the incident took place, testified that, when he was about two blocks away from his home, he "heard a volley of shots. Sounded like someone had expended about a magazine." Jackson continued his short drive home and upon arrival "did just a kind of a walk around the house to -- just to see what was going on." While looking around, he found Lee's body, "flat on her back" on the drainage easement beside his house, which continued to run down an alley behind his home. Jackson stated that Lee had a wound to her right temple and that "[t]here was some tissue on the ground. Her pupils were fixed and dilated, and she was having a seizure." Jackson immediately called 9-1-1 for an ambulance and waited for it to arrive. A police officer arrived before the ambulance, and Jackson provided him with his recollection of the events.[4]

Mark Sullivan, who was assigned to the Texarkana, Texas Police Department Criminal Investigation Division, Crime Scene Unit, and who was admitted as an expert in crime scene investigation, testified that he was dispatched to the scene after being advised that a female victim had suffered a gunshot wound to her head. Sullivan photographed the overall scene. Trying to determine where the gunshots had originated, Sullivan was advised that there were no shell casings

---

[4]Jonathon Price, an officer with the Texarkana, Texas Police Department, testified that he spoke to several people in the area who said they heard shots fired in the neighborhood. One of those individuals stated that he heard eight shots fired.

5

in the area where Lee had been located. Sullivan said he was then dispatched to the hospital to take photographs of Lee's injuries. After doing so, he returned to the scene. When he arrived back at the crime scene, Sullivan was informed that officers had located a few shell casings. Among other observations, Sullivan "observed three cartridge cases on the driveway in front of apartment 108." He also determined that Lee's body was 188 yards away from the shell casings.

At trial, Sullivan was shown one of the autopsy photographs of the wound to Lee's head. Sullivan was then asked, "Is there anything about this photograph that you can tell about how this bullet entered the victim, as far as the path?" Sullivan responded, "That path there looks more of a trajectory that is straight-on." He continued, "You have the abrasion mark that's caused by the impact of the bullet around the skin, but the circular of that bullet defect indicates that that bullet was not tumbling or anything. It was a straight trajectory whenever it struck the victim's head." Sullivan opined that, if someone had shot up into the air, you would not "expect to see something such as this." In his opinion, from observing Lee's wound, the bullet that killed her was on a direct path.

The State also called Nathan Tunnell, a firearms examiner at the Texas Department of Public Safety Crime Laboratory in Tyler, Texas. Tunnell examined and test fired the Taurus 9mm handgun that Walker used in the shooting. Additionally, Tunnell examined bullets collected from the crime scene and compared them with bullets he test fired from the Taurus handgun. Based on his analysis, Tunnell opined that the bullets found at the crime scene had been fired from the Taurus handgun. Finally, Tunnell examined a bullet that the medical examiner had taken from the victim.

6

Based on Tunnell's examination, he opined that that bullet had been fired from the Taurus handgun as well.

After hearing the testimony, the jury found Walker guilty of felony murder, and the trial court sentenced him to fifty-five years in prison and a $10,000.00 fine. This appeal followed.

## II. Discussion

### A. The Evidence Was Sufficient to Support the Jury's Verdict

In his first issue, Walker contends that the evidence was legally insufficient to support his conviction of felony murder. In evaluating legal sufficiency here, we must review all the evidence in the light most favorable to the verdict to determine whether any rational fact-finder could have found, beyond a reasonable doubt, that Walker was guilty of felony murder. *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)).

We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the fact-finder "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19). Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not

7

unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

A person commits felony murder when he commits or attempts to commit an act that is clearly dangerous to human life and that causes the death of an individual, while in the course of committing, in furtherance of, or in immediate flight from the commission or attempt to commit a felony, other than manslaughter. TEX. PENAL CODE ANN. § 19.02(b)(3). Here, the State alleged that the underlying felony was deadly conduct.[5] It is well established under Texas law that "[d]eadly conduct can be the underlying felony for felony murder." *See Barfield v. State*, 202 S.W.3d 912, 914 n.1 (Tex. App.—Texarkana 2006, pet. ref'd); *see also Johnson v. State*, 4 S.W.3d 254, 255–58 (Tex. Crim. App. 1999) (felony murder does not require proof of any additional dangerous act beyond that covered by the underlying felony). A person commits deadly conduct under Section 22.05 by knowingly discharging a firearm at or in the direction of one or more individuals. *See* TEX. PENAL CODE ANN. § 22.05(b)(1).

Walker concedes that there was "some evidence" that he fired the gun in the air once and "some evidence" that he fired the gun several more times after firing into the air. Yet, Walker maintains that Neal's testimony was "the sole evidence that Walker discharged the handgun in the direction of Murquan Neal or Chris Shavers." He states, "[I]t is unclear and is only potentially

---

[5]The State's indictment against Walker alleged that, on or about January 31, 2018, he

> did then and there, intentionally or knowingly commit or attempt to commit a felony offense, to wit: <u>Deadly Conduct</u>, and while in the course of and in the furtherance of the commission or attempt of said offense did then and there commit or attempt to commit an act clearly dangerous to human life, namely, <u>knowingly discharge a firearm at or in the direction of an individual and/or individuals, namely Murquan Neal and/or Christopher Shavers</u>, that caused the death of <u>Kaitlin Lee</u>.

8

some evidence that Walker discharged the weapon 'towards' Neal." For this reason, Walker contends that the State failed to prove the elements of the underlying felony of deadly conduct.

When there is a question of sufficiency, an appellate court must evaluate all the evidence, both direct and circumstantial. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). In doing so, we must keep in mind that, as the sole judge of the weight and credibility of the evidence, the jury was free to accept or reject any, all, or none of Neal's testimony relating to his version of the incident. *See Upton v. State*, 853 S.W.2d 548, 552 (Tex. Crim. App. 1993). That said, even if Neal's testimony were the *only* evidence showing that Walker shot the gun in his direction, his eyewitness testimony was sufficient evidence to support the State's burden of proving that Walker knowingly discharged the firearm at or in Neal's direction. Moreover, the additional testimony from the other witnesses that they saw Walker with the gun and also saw him fire the gun once was, at least, some support of Neal's testimony. We, therefore, find that Walker's contention lacks merit.

Next, Walker contends that, because the State failed to show "that the fifth to seventh bullets (which had been directed toward . . . Neal) struck and killed [Lee,]" it failed to meet its burden of proof. In other words, Walker claims that the evidence presented by the State could not support a finding that Walker knowingly discharged a firearm at or in the direction of Neal, causing Lee's death. Instead, Walker maintains that the initial bullet he fired into the air, as opposed to any of the subsequent bullets he aimed toward Neal, "could have been" the cause of Lee's death.[6]

_____

[6]Notably, Walker concedes the following:

> The State presented evidence that [Lee] was killed by a bullet from the handgun discharged by Travon Walker. Nathan Tunnell, a DPS crime lab expert on firearms testified at trial. He tested the

9

Contrary to Walker's contention, there was sufficient proof that one of the subsequent gunshots fired by Walker toward Neal, rather than the first shot fired into the air, caused Lee's death. Sullivan, an expert in crime scene investigation, testified that, after looking at Lee's wound in the autopsy photographs, he found that Lee was not shot by a bullet that had traveled up into the air. Instead, Sullivan stated that the bullet took a direct path. Because of Sullivan's testimony, the jury was well within its discretion to find that Lee was shot and killed after Walker fired several shots in Neal's direction and not, as Walker contends, when he shot up in the air.

We, therefore, overrule Walker's first point of error.

**B.** **The Trial Court Did Not Err When It Admitted Autopsy Photographs**

Next, Walker contends that the trial court abused its discretion when it admitted three autopsy photographs of Lee (State's Exhibits 26, 27, and 28) because their prejudicial value outweighed their probative value. We disagree.

First, Walker complains of the admission of State's Exhibit 26, a frontal photograph of Lee's face. "[F]or an issue to be preserved on appeal, there must be a timely objection that specifically states the legal basis for the objection." *Rezac v. State*, 782 S.W.2d 869, 870 (Tex. Crim. App. 1990). Despite the exception of the right of trial by jury, a defendant can waive any trial error, including constitutional error, by failing to either object properly or request the proper relief. *Thompson v. State*, 802 S.W.2d 840, 842 (Tex. App.—Houston [14th Dist.] 1990, pet.

---

Taurus 9mm handgun. He testified that bullets collected at the scene had been fired from that gun. Additionally, the medical examiner had offered State's Exhibit 29, the bullet taken from [Lee]. Tunnel opined that the bullet taken from the victim was fired from that handgun.

(Citations omitted).

10

ref'd); *see* TEX. CODE CRIM. PROC. ANN. art. 1.14. Here, because Walker failed to make an objection to State's Exhibit 26, he has waived any error for our review.

As to the remaining two exhibits, photographs of Lee's face visibly showing the wound, Walker argued at trial that they were "gratuitous photos of the same wound." The State responded, "Your Honor, the [S]tate's position in the second and third photographs in talking with the medical examiner is one -- is the second photo shows a further out view of the bullet location itself. There is more detail as it is zoomed in in the third photograph." The trial court overruled Walker's objection to the photographs, finding that they were "not overly gratuitous," that they were "limited to two," and that one showed "more detail of the wound, and one has a -- one is further out and gives a better location of the wound."

On appeal, Walker argues that, under Rule 403 of the Texas Rules of Evidence, the two photographs were more prejudicial than probative. Even assuming Walker's objection at trial constituted a Rule 403 objection, the trial court did not err when it admitted the autopsy photographs of Lee.

Rule 403 of the Texas Rules of Evidence provides that evidence, although relevant, may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury or by considerations of undue delay or needless presentation of cumulative evidence. TEX. R. EVID. 403. Even so, "Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006). We review a trial court's decision on a Rule 403 objection under an abuse of discretion standard, and we disturb the

11

trial court's ruling only when the ruling falls outside the zone of reasonable disagreement. *Jones v. State*, 944 S.W.2d 642, 651 (Tex. Crim. App. 1996).

In determining a Rule 403 objection, a trial court must "consider the inherent tendency that [the] evidence may have to encourage resolution of material issues on an inappropriate [emotional] basis." *Narvaiz v. State*, 840 S.W.2d 415, 429 (Tex. Crim. App. 1992) (quoting *Fuller v. State*, 829 S.W.2d 191, 206 (Tex. Crim. App. 1992)). Next, the trial court must balance that inherent tendency, if any, against "the host of factors affecting probativeness, including [the] relative weight of the evidence and the degree to which its proponent might be disadvantaged without it." *Id*. Many factors may be considered in determining whether the danger of unfair prejudice substantially outweighs the probative value of the photographs, including "the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or color, whether they are close-up, whether the body is naked or clothed[, and] . . . the availability of other means of proof and the circumstances unique to each individual case." *Emery v. State*, 881 S.W.2d 702, 710 (Tex. Crim. App. 1994), (quoting *Long v. State*, 823 S.W.2d 259, 272 (Tex. Crim. App. 1991)). In general, photographs are admissible where verbal testimony about the same matters is admissible. *Ramirez v. State*, 815 S.W.2d 636, 647 (Tex. Crim. App. 1991).

Although a person could find the two complained-of photographs to be rather unpleasant, neither of them were gruesome or particularly offensive, and neither was intended to "horrify or shock the viewer."[7] *See Ashcraft v. State*, 918 S.W.2d 648, 656 (Tex. App.—Waco 1996, pet.

---

[7]Contrary to Walker's description of the exhibits as "gruesome photographs of the victim's corpse," both were close-up shots of Lee's face, showing only what appeared to be a cleaned wound.

12

ref'd). Walker also concedes that, at trial, "the photographs were discussed briefly with a witness, offered, and after a discussion, admitted." Thus, the State did not spend an inordinate amount of time drawing the jury's attention to the photographs. Walker also complains that the photographs were cumulative because they twice pictured Lee's wound. Yet, if autopsy photographs aid the jury in understanding an injury and do not unnecessarily emphasize the damage or mutilation caused by the autopsy, they are admissible at trial. *Davis v. State*, 313 S.W.3d 317, 331 (Tex. Crim. App. 2010) (citing *Santellan v. State*, 939 S.W.2d 155, 172 (Tex. Crim. App. 1997)).

Here, the two photographs, taken at similar angles but different distances, aided the jury in understanding Lee's injury. They also helped the jury determine a major issue in the case—whether the bullet that killed Lee was shot into the air or in a direct line of fire. Moreover, neither of the photographs emphasized the damage caused by the bullet, and neither reveal any mutilation caused by an autopsy.

We, therefore, conclude that the two photographs in question were material and relevant to the issues raised at trial and that their prejudicial value did not outweigh their probative value. Under these circumstances, the trial court's decision to overrule Lee's objection and admit the complained-of photographs fell within the zone of reasonable disagreement and, thus, did not constitute an abuse of discretion. *See Jones*, 944 S.W.2d at 651.

As a result, we overrule Walker's second point of error.

13

### III.     Conclusion

We affirm the trial court's judgment.

                                        Scott E. Stevens
                                        Justice

Date Submitted:     December 3, 2019
Date Decided:       December 16, 2019

Do Not Publish