**Wilburn Paul DRIGGERS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 06–95–00179–CR.**

Court of Appeals of Texas, Texarkana.

Submitted Oct. 31, 1996.

Decided Nov. 22, 1996.

Order Overruling Rehearing March 17, 1997.

Ebb B. Mobley, Longview, for appellant.

C. Patrice Savage, Assistant District Attorney of Gregg County, Longview, Matthew William Paul, State Prosecuting Attorney, Austin, for appellee.

Before CORNELIUS, C.J., and GRANT and STARR, JJ.

## OPINION

GRANT, Justice.

Wilburn Driggers appeals from his conviction for aggravated sexual assault. Driggers contends that the trial court erred by allowing the complainant to testify by closed-circuit television, because there was insufficient evidence to show the necessity for the use of

that procedure; that the evidence is insufficient to support his conviction; and that the court erred by excluding evidence of marital difficulties between him and his wife, Mary Driggers.

Driggers was convicted of aggravated sexual assault upon his six-year-old daughter. The evidence against him consisted of the testimony of the daughter, which was presented to the jury via closed-circuit television. The daughter testified that he had shown her "dirty books" on two occasions, and on the last occasion had masturbated in front of her and had directed her to rub and lick his privates. She informed her mother about the acts, and the mother reported her claims to Child Protective Services and the White Oak Police Department. Based on her testimony, the jury convicted Driggers and sentenced him to ten years' incarceration.

At the time of the incident, it is fair to say that the evidence shows that the marriage was already seriously troubled. By the time of the trial, divorce proceedings were in progress. As pointed out by the appellant, between the time of the charge and the trial, the mother had offered to let the daughter visit her father for a month in Arkansas. A.J. Randall, one of the officers who spoke with the child, voiced his reservations about the verity of the child's story.

Driggers first contends that the trial court erred by allowing the complainant to testify solely by closed-circuit television, because the evidence did not support the necessity of using that procedure. The use of this procedure is governed by Tex.Code Crim. Proc. Ann. art. 38.071 (Vernon Supp.1997). The point of error does not specify whether Driggers is complaining on statutory or constitutional grounds, but the latter portions of his argument under this point discuss constitutional issues in relation to United States Supreme Court authority.

In this case, Driggers contends that the requirements of Article 38.071 were not met. The Code provides that the court may permit closed-circuit testimony upon a finding that the minor is "unavailable." Tex.Code Crim. Proc. Ann. art. 38.071, § 1. "Unavailable" is thereafter defined as follows:

> In making a determination of unavailability under this article, the court shall consider relevant factors including the relationship of the defendant to the child, the character and duration of the alleged offense, the age, maturity, and emotional stability of the child, and the time elapsed since the alleged offense, and whether the child is more likely than not to be unavailable to testify because:
>
> (1) of emotional or physical causes, including the confrontation with the defendant or the ordinary involvement as complainant in the courtroom trial; or
>
> (2) the child would suffer undue psychological or physical harm through his involvement at trial.

Tex.Code Crim. Proc. Ann. art. 38.071, § 8(a).

The constitutionality of this statute was addressed in relation to both the federal and Texas constitutions in *Gonzales v. State*, 818 S.W.2d 756 (Tex.Crim.App.1991). The Court concluded that on the issue of face-to-face confrontation, the state constitution provided no greater rights than the federal, and that the reasons expressed by the legislature for enacting this statute—safeguarding the physical and psychological well being of a minor— were legitimate and compelling state goals.

Driggers first argues that the oral finding by the trial court was not a sufficient finding of necessity for use of the closed-circuit arrangement. *Gonzales* adopted the *Craig*[1] analysis, which sets out three criteria that are to be considered by the trial court in reaching its decision under this statute.

■ The court must determine (1) that the use of the one-way closed-circuit procedure is necessary to protect the welfare of the particular child witness who seeks to testify; (2) that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant; and (3) that the

---

1. *Maryland v. Craig*, 497 U.S. 836, 855–56, 110 S.Ct. 3157, 3168–69, 111 L.Ed.2d 666, 685 (1990).

emotional distress suffered by the child witness in the presence of the defendant is more than de minimis, i.e., more than mere nervousness or excitement or some reluctance to testify.

Three months later, the Court revisited this issue, and pronounced that, in *Gonzales,* it had held that specific findings must be made on each of these factors in order to meet constitutional requirements. *Hightower v. State,* 822 S.W.2d 48, 51 (Tex.Crim.App. 1991). In *Hightower,* the State presented a motion upon which the trial court ruled without conducting an evidentiary hearing, and without making any written findings. The court acknowledged that written findings are not required by the statute, and then abated the cause so that an evidentiary hearing could be conducted and findings of fact and conclusions of law be entered. Although the court ordered written findings to be entered, it is not clear that the court would have returned the case solely on that basis, because the court also returned the case for an evidentiary hearing on the issue where none had previously been conducted.

■ In this case, an evidentiary hearing was conducted. The question presented by Driggers is whether the trial court's ruling is sufficient to meet the above criteria. At the conclusion of an evidentiary hearing on the issue of using the closed-circuit system, the trial court ruled as follows.

I find that all the requirements of the law for the use of the closed circuit TV have been fully proved to this Court's satisfaction, that the child would, in fact, be traumatized if this procedure were not—further traumatized if this procedure were not used. Therefore, the State's motion is in all things granted by the Court. That's it.

The oral findings of the trial court in this case are substantially less specific and thus less revealing of the court's reasoning than are the written findings set out in *Hightower v. State,* 822 S.W.2d at 52.

After concluding that the findings were inadequate, we abated this case so that the trial court could enter findings, which has now been done. In written findings, the trial court stated that (1) the child was seven at

the time of trial; (2) the defendant was her father; (3) the child would not be able to verbalize in his presence; and (4) that a face-to-face confrontation would be traumatic and not in the best interest of the child's welfare.

Based upon these findings, the court held that (1) the closed-circuit procedure was necessary to protect the welfare of the victim; (2) the child would have been traumatized by the defendant's presence; and (3) the emotional and psychological impact on the child in the defendant's presence would be more than nervousness or a reluctance to testify.

The court's error has been cured, and this point of error is overruled.

■ Driggers next contends that the evidence is factually insufficient to support the verdict. In our review of the factual sufficiency of the evidence, we view all the evidence and set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Clewis v. State,* 922 S.W.2d 126 (Tex.Crim. App.1996); *Lisai v. State,* 875 S.W.2d 35, 37 (Tex.App.—Texarkana 1994, pet. ref'd); *Stone v. State,* 823 S.W.2d 375, 381 (Tex. App.—Austin 1992, pet. ref'd, untimely filed).

■ The evidence against Driggers consists of the testimony of his six-year-old daughter (seven at the time of trial). She testified that he had shown her pornographic magazines on at least two occasions and that she knew it was wrong for her to be looking at them. She testified that, while sitting with him on the couch in their living room, he had masturbated while looking at one of the magazines. While doing so, he asked her to rub his penis, which she did. He then asked her to lick him, which she did. She testified that his penis was inside her mouth. She further testified that the overt sexual contact occurred only once, in September. She reported the contact in December of the same year.

The mother, Mary Driggers, testified that the child told her about the acts on December 19, 1994. The mother testified that she had not believed the child at first, but began to do so after spending a day questioning her. After going to a baby-sitter for sup-

port, she contacted Child Protective Services and the local police department. After being interviewed by a service worker, she gave a police officer a number of pornographic magazines that had been in the home. She also testified that she had once caught the child looking through the magazines.

Child Protective Services worker Katy Wady testified that she had interviewed the child and related specific items that she looks for in children's testimony to determine whether they have been coached or if their stories are rehearsed, and stated that those factors were not present in the child's testimony.

In the testimony of police officer A.J. Randall, he questioned the truthfulness of the child's account and the facts provided because he had some concern about the smoothness of the young child's first recounting of her allegations.

Driggers's father testified that in his observations, the appellant and the child had a happy and close relationship, recounting specific occasions when he had seen them together after the date of the alleged abuse. A counselor, Paula Bradley, testified that it was not unusual for an abused child to remain affectionate toward that parent.

Driggers's stepmother testified that appellant was placed in the role of the disciplinarian in the family and that the children would not mind their mother.

Driggers testified that he and his wife had looked at the magazines together and denied that he had ever shown the magazines to the child or had any sexual contact with her.

In this case, we have two distinctly different versions of events. It is the jury's job to judge the credibility of the witnesses and the weight to be given their testimony, and it may resolve or reconcile conflicts in the testimony, accepting or rejecting such portions thereof as it sees fit. *Banks v. State,* 510 S.W.2d 592 (Tex.Crim.App.1974). After reviewing all of the evidence, we find that the jury's verdict is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Clewis,* 922 S.W.2d 126. This point of error is overruled.

■ Driggers next contends that the trial court erred by excluding his proffer of evidence about the marital difficulties between Mary Driggers and the appellant. This evidence was offered as being relevant to his defensive theory that this accusation was contrived by the mother as a potential weapon in the event that there was a divorce between the parents. This would assure the mother custody of the daughter; thus she had a motivation to coach the daughter on the accusation and to fabricate the outcry testimony.

The practice of exposing a witness's motivation to testify against a defendant is a "proper and important function of the constitutionally protected right of cross-examination." *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Miller v. State,* 741 S.W.2d 382, 389 (Tex. Crim.App.1987).

> In exercising this right, a defendant is allowed great latitude to show any fact which would tend to establish ill feeling, bias, motive, and animus on the part of the witness testifying against him.

*Miller,* 741 S.W.2d at 389; *see Tucker v. State,* 771 S.W.2d 523, 531 (Tex.Crim.App. 1988), *cert. denied,* 492 U.S. 912, 109 S.Ct. 3230, 106 L.Ed.2d 578 (1989).

■ Cross-examination serves three purposes: to identify the witness with his community so that independent testimony may be sought and offered concerning the witness's reputation for veracity in that community; to allow the jury to assess the credibility of the witness; and to bring facts forward that tend to discredit the witness by showing that his testimony was untrue or biased. *Carroll v. State,* 916 S.W.2d 494, 497 (Tex. Crim.App.1996).

■ A court may impose limits on crossexamination into the bias of a witness and what collateral evidence is material for that purpose. *Miller,* 741 S.W.2d at 389, *citing Green v. State,* 676 S.W.2d 359 (Tex.Crim. App.1984). Such restrictions may be based on concerns such as harassment, prejudice, confusion of issues, the witness's safety, or interrogation that is repetitive or marginally relevant. *Miller,* 741 S.W.2d at 389.

■ The State categorizes this testimony as impeachment of the child's testimony by a separate witness rather than cross-examination designed to expose a motive for the mother to fabricate a story in pursuit of child custody during a divorce. The State thus categorizes the proffer as an attempt to show a specific instance of conduct in order to attack the credibility of the witness, applying Tex.R.Crim. Evid. 608(b):

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in Rule 609, may not be inquired into on cross-examination of the witness nor proved by extrinsic evidence.

This rule, by its terms, is very restrictive and allows for no exceptions. *Ramirez v. State,* 802 S.W.2d 674, 676 (Tex.Crim.App.1990).

The interplay between these lines of authority was addressed in *Moody v. State,* 827 S.W.2d 875, 891 (Tex.Crim.App.1992). In its analysis, the court drew the distinction between evidence attacking or supporting a witness's character for truthfulness and evidence showing that the witness either had some motive to lie or had some bias against the defendant that would impact his testimony. The court concluded that if the evidence would show bias or motive by the witness against the defendant, the evidence should be admitted as a part of constitutionally protected examination. *See* Hulen D. Wendorf & David A. Schlueter, Texas Rules of Evidence Manual VI 48–49 (3d ed. 1994).

In this case, the evidence was offered in an attempt to show a specific motive for the witness (the mother) to coach her daughter (the victim) into telling a particular story to caseworkers and later at trial and to fabricate what the child had told her. The testimony was admissible cross-examination of the mother, and the trial court erred by refusing the proffer.

In light of the error, we must apply a harmless error analysis to determine whether the error made no contribution to the conviction or the punishment. Tex.R.App. P. 81(b)(2); *Shelby v. State,* 819 S.W.2d 544, 551 (Tex.Crim.App.1991).

The procedure to be followed in reviewing a violation of the right to cross-examine under the confrontation clause is a three-prong analysis. First, we must assume that the damaging potential of the cross-examination was fully realized. Second, with that assumption in mind, we review the error in connection with the following factors.

1) The importance of the witness's testimony in the prosecution's case;

2) Whether the testimony was cumulative;

3) The presence or absence of evidence corroborating or contradicting the testimony of the witness on material points;

4) The extent of cross-examination otherwise permitted; and,

5) The overall strength of the prosecution's case.

Finally, in light of the first two prongs, we must determine if the error was harmless beyond a reasonable doubt. *Delaware,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674; *Shelby,* 819 S.W.2d at 547.

■ The testimony was preserved as a bill of exceptions. The mother testified that she had been involved in affairs during the latter stages of marriage, that she had filed for divorce in 1988 and 1989, and that a man had moved in with her in 1994, three months after Driggers filed for divorce.

1) This witness's testimony was of importance in this case because she was the mother of the victim, as well as the person whom the victim first told of the assault.

2) The witness's testimony as to the sexual assault was cumulative of the victim's testimony and much less fact-specific.

3) The mother's testimony was that the daughter had first told her about the assault on December 19, followed by an explanation of the four-day delay in reporting to officials. The daughter's testimony corroborates the mother's. The mother's testimony was contradicted by the testimony of the accused, who testified that no assault occurred and that he had never shown the child the pornographic books that she described.

4) The scope of cross-examination of the mother was not otherwise restricted. Dur-

ing her examination she testified that she had sought to divorce the accused twice during their marriage and that she and her husband had discussed getting a divorce during the last year.

5) The overall strength of the prosecution's case rests solely upon the credibility of the child's testimony and the recounting of her outcry.

The defense relied upon the following propositions: (1) The event never occurred. (2) The child is lying. (3) The reason she is lying is because her mother coached her into doing so, because (4) she knew a divorce was likely, as shown by her affair at the time of the alleged abuse, and knew that allegations of child abuse—whether proven or unproven—would ensure that upon divorce she would get custody of the two children of the marriage.

The only material testimony, preserved by the bill of exceptions, that was not allowed into evidence was testimony about the mother's extramarital relationships during the last year of marriage. Because the jury had already heard her testimony that divorce had been discussed by the parties during the last year and that the mother had already sought to divorce the accused on two other occasions, the possibility of a divorce between the mother and father had already been injected into the trial. While it could be argued that the extramarital affairs increased the probability of the divorce, the possible motivation caused by a contemplated divorce was already before the jury without getting into possible causations of the potential divorce. Applying the five-rule test stated above, we find beyond a reasonable doubt that the error was harmless and that the exclusion of this testimony made no contribution to the conviction or the punishment. TEX.R.APP. P. 81(b)(2).

Driggers contends in an additional point of error that the trial court abused its discretion by denying his motion for new trial based upon newly discovered evidence.

The State contends that this court may not suspend the timetable for filing a motion for new trial because the motion is not provided for in the Rules of Appellate Procedure, and because applicable caselaw provides that the timetables provided in those rules may not be suspended.

The latest case referring to this general question is *State v. Garza*, 931 S.W.2d 560 (Tex.Crim.App.1996). In that case, the defendant was tried and filed a motion for new trial that was not timely ruled upon by the trial court, which nevertheless conducted a new trial. The State did not at that time contest the second trial. After the second trial, however, Garza appealed, presumably because in the second trial he received a forty-year sentence, instead of the initial ten-year sentence. Garza then asked the Corpus Christi Court of Appeals to hold the second trial to be a nullity because his motion for new trial was never granted. The court agreed, refusing to use TEX.R.APP. P. 2(b) [2] to retroactively allow the trial court to grant an untimely motion for new trial.

The State contended in the Court of Criminal Appeals that the court of appeals erred because "good cause" for suspending the appellate rules was shown as a matter of law. The Court of Criminal Appeals disagreed, noting that the State failed to utilize other options such as its own appeal from the first judgment or from the alleged grant of the initial motion for new trial. The court noted that Rule 2(b) does not authorize an appellate court to *extend its own jurisdiction.* The court then went on to hold that Rule 2(b) "does not authorize courts of appeals to reach back after appeal has been perfected and the record filed, and alter the course of

2. **(a) Relationship to Jurisdiction.** These rules shall not be construed to extend or limit the jurisdiction of the courts of appeals, the Court of Criminal Appeals or the Supreme Court as established by law.

**(b) Suspension of Rules in Criminal Matters.** Except as otherwise provided in these rules, in the interest of expediting a decision or for other good cause shown, a court of appeals or the

Court of Criminal Appeals may suspend requirements and provisions of any rule in a particular case on application of a party or on its own motion and may order proceedings in accordance with its direction. Provided, however, that nothing in this rule shall be construed to allow any court to suspend requirements or provisions of the Code of Criminal Procedure.

events at the trial court level." Thus, the Court of Criminal Appeals concluded that a court of appeals may not retroactively suspend rules governing events that have already occurred at the trial level before the record has been conveyed to the appellate court.

The Court of Criminal Appeals then indicated that the rule contemplates only situations where suspending a rule will facilitate processing the case through the appellate court.

The present case does not involve a situation where an appellate court is altering the flow of events which are already final. Rather, we are providing for an evidentiary hearing and re-vesting jurisdiction in the trial court through abatement so that an evidentiary claim might be properly considered by the only court equipped for its review.

The State has cited this court to no other authority for its position that abatement is inappropriate because it would limit this court's jurisdiction. If so, then this court could not abate a case for a factual hearing on any issue except perhaps those explicitly provided by other rules.

The State has confused a limitation on our jurisdiction with an exercise of our jurisdiction. Neither Rule 2 nor *Garza* prevent this court from abating a case for a hearing, even if its ultimate result may be a grant of new trial by the trial court and concomitant dismissal of a pending appeal. This would certainly meet the court's procedural requirement that any suspension of the rules would facilitate processing the case through the court system.

In *Harris v. State*[3] and *Tuffiash v. State*,[4] the stated reason for granting a motion to abate was because newly discovered evidence was not cognizable in a post-conviction writ of habeas corpus. Therefore, if such evidence can be considered in a post-conviction writ of habeas corpus, this court should not abate for a hearing.

3. *Harris v. State,* 818 S.W.2d 231 (Tex.App.—San Antonio 1991, no pet.).

4. *Tuffiash v. State,* 878 S.W.2d 197, 198 (Tex. App.—San Antonio 1994, pet. ref'd).

The first question is whether newly discovered evidence may be considered in a habeas proceeding. *Ex parte Binder,* 660 S.W.2d 103 (Tex.Crim.App.1983), held that it could not. *Binder* was overruled in part by *State ex rel. Holmes v. Third Court of Appeals,* 885 S.W.2d 389, 398 (Tex.Crim.App. 1994). In *Holmes,* the Court recognized that to allow an innocent man to be executed would surely be a violation of his constitutional rights.[5] Under longstanding case law, habeas will lie to review denials of constitutional rights. Therefore, the court overruled *Binder* and permitted the defendant to raise newly discovered evidence in pursuing the constitutional claim.

The State argues that this holding reaches far enough to apply to defendants who are merely incarcerated as opposed to being executed, and that the remedy corresponds with that available in a motion for new trial. This position was absolutely rejected by the San Antonio Court in *Tuffiash,* 878 S.W.2d at 198.

In *Tuffiash,* newly discovered evidence was claimed to exist by the defendant in his motion for an out-of-time new trial. The court looked to see if habeas relief was available and concluded that it was not for newly discovered evidence. However, perjury was alleged, and that *does* form a basis for habeas relief. Nevertheless, the court found that the "interest of justice would be served by allowing an out-of-time motion for new trial." Then the court looked to see if there was 'good cause' for allowing the filing and concluded that the high likelihood of perjury in this case showed good cause for suspending the rules.

On rehearing, the State argued that *Binder* had been wholly overruled, and that any claim of newly discovered evidence could be addressed in a habeas proceeding. The court noted that *Binder* was not wholly overruled and that the breadth of *Holmes* was not clear. "Further, *Holmes* creates a very high threshold showing of innocence and an

5. *Citing Herrera v. Collins,* 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), for the position that such an execution would violate the Due Process Clause of the Fourteenth Amendment.

extremely difficult burden of proof for a habeas applicant raising newly-discovered evidence." The court also recognized that it was much more efficient to address such questions now, rather than waiting through a necessarily incomplete appeal, then requiring appellant to seek post-conviction relief to obtain a new trial many years from now. The court limited the availability of such relief to cases where the failure to raise the issue timely was not due to appellant's lack of diligence. We find this analysis correct, and that abatement was therefore an available remedy.

Even if we assume, however, that the State's position is correct, the next question is whether this court can nevertheless abate for a hearing even if some other remedy is available. The State has directed this court to no authority that answers this question directly. Indeed, on discretionary review, the Court of Criminal Appeals remanded a case (the initial opinion authored by this Court) to the Houston Court of Appeals so that it might consider this very question in *State v. Adams*, 930 S.W.2d 88 (Tex.Crim. App.1996).

In that case, the court reviewed an opinion by the Houston First Court following our abatement[6] of the *Adams* and *Chambers* cases to the trial court for a hearing on an out-of-time motion for new trial. On the basis of comity, the Houston court refused to address the question of whether our abatement was proper. The court remanded with directions to address the question.

We simply note that this question has been addressed by the First Court of Appeals in the past, and that it concluded that the trial court did have jurisdiction following such an abatement. *Cox v. State*, 797 S.W.2d 958 (Tex.App.—Houston [1st Dist.] 1990, no pet.).

Justice requires that admissible new evidence be considered to determine if this new evidence taints the conviction. Considering this matter while the case is still pending eliminates the necessity of later having to address this issue on a writ of habeas corpus. When possible, courts should strive to avoid

a multiplicity of actions and to expedite justice by doing it now, not doing it later.

We conclude that if good cause for abatement for the purpose of holding an evidentiary hearing is shown, one may be held.

■■■ The granting or denying of a motion for new trial lies within the discretion of the trial court. We do not substitute our judgment for that of the trial court, but rather decide whether the trial court's decision was arbitrary or unreasonable. *Lewis v. State*, 911 S.W.2d 1, 7 (Tex.Crim.App.1995); *State v. Gonzalez*, 855 S.W.2d 692, 696 (Tex.Crim. App.1993). Motions for new trial based on newly discovered evidence are not favored by the courts and are viewed with great caution. *Drew v. State*, 743 S.W.2d 207, 225–26 (Tex. Crim.App.1987).

■■■ The trial court heard the testimony of the victim recanting every line of her testimony at trial. She testified that she had lied when she stated that Driggers had engaged in sexual acts with her, and that she had lied because Driggers (as the primary disciplinarian of the household) had spanked her harder and more often than she appreciated and that she was getting even with him by lying about him.

TEX.CODE CRIM. PROC. ANN. art. 40.001 (Vernon Supp.1997) applies to this case and provides, "A new trial shall be granted an accused where material evidence favorable to the accused has been discovered since trial."

■■■ To show that the trial court abused its discretion in not granting a new trial, the record must reflect that (1) the newly discovered evidence was unknown to the movant at the time of trial; (2) the movant's failure to discover the evidence was not due to his want of diligence; (3) the evidence was admissible and not merely cumulative, corroborative, collateral, or impeaching; and (4) the evidence was probably true and would probably bring about a different result in another trial. *Moore v. State*, 882 S.W.2d 844, 849 (Tex. Crim.App.1994).

■■■ The State argues that Driggers failed to establish the fourth prong, that the new evidence is probably true and would

---

6.   *State ex rel. Holmes v. Shaver,* 824 S.W.2d 285     (Tex.App.—Texarkana 1992)(orig.proceeding).

probably bring about a different result in another trial. In cases when a witness has testified to material inculpatory facts against an accused and after verdict, and before a motion for new trial has been acted upon, if the witness makes an affidavit that he testified falsely, the general rule is that the new evidence is probably true and a new trial should be granted. *See Williams v. State*, 375 S.W.2d 449, 451 (Tex.Crim.App.1964).

■ An exception exists where the recantation is found not to be credible in light of the trial evidence. *Id.; Villarreal v. State*, 788 S.W.2d 672, 673 (Tex.App.—Corpus Christi 1990, pet. ref'd). Another exception exists where evidence is produced at the new trial hearing to show that the recantation is not credible or pressured. *Dillard v. State*, 550 S.W.2d 45, 52 (Tex.Crim.App.1977); *Villarreal*, 788 S.W.2d at 673.

■ Further, in new-evidence cases, the credibility of the witnesses and the probable truth of the new evidence is primarily a determination for the trial judge. *Etter v. State*, 679 S.W.2d 511, 515 (Tex.Crim.App. 1984); *Williams v. State*, 504 S.W.2d 477, 483 (Tex.Crim.App.1974). As in all reviews of situations involving witness credibility, the judge is able to determine the credibility of the witnesses by observation in a way that an appellate court cannot duplicate from a cold record.

If the newly discovered evidence is of questionable weight and credibility, and would probably not bring about a different result upon a new trial, the court does not abuse its discretion in refusing a new trial. *Jones v. State*, 711 S.W.2d 35, 37 (Tex.Crim. App.1986); *Lyon v. State*, 885 S.W.2d 506, 518 (Tex.App.—El Paso 1994, pet. ref'd).

Driggers's motion for new trial was based on the newly discovered evidence of the victim's recantation of her trial testimony. We do not determine the victim's credibility. What we have to determine is whether the trial court abused its discretion in not accepting her new testimony as true. We therefore review the record to determine if there is any evidence that reasonably supports the court's decision.

The judge, who also originally heard the case, had no direct testimony before him that would allow him to conclude that the witness's recantation was false. If he could reach such a conclusion, it is because of other factors shown at the hearing.

The victim testified that she was changing her testimony "[b]ecause my daddy would also give me the hardest whipping and I wouldn't like it and I got really mad at him." She also testified that since this happened her grandparents have not talked to her, that her mom never took her to a counselor after she made her statement that it didn't happen, and that she had been sad since this all happened and she was in court. The mother acknowledged that she had failed to take the child to counseling, even though it was free. The victim also testified that her mother's new boyfriend called her a liar about her allegations.

Katy Wady, the investigator for protective services who originally interviewed the victim, testified that when she went to the mother's home to reinterview the child, the mother told her that Driggers had been trying to get her to encourage the victim to admit that she lied. The mother told Wady that she did not remember the circumstances of the victim first recanting the story. Wady testified that the new boyfriend made several statements to the effect that he believed the victim was lying.

Wady testified that when she asked the victim whether anyone had told her what to say, her response was "I don't remember." Wady also testified that there was a marked difference between the victim's spontaneous answers during her original interview and her reflective, hesitant answers to questions at the second interview.

Paula Bradley, a counselor, testified that recantation was not unusual in child abuse cases, explained why it was not unusual, and explained the extreme difficulty a young child has in dealing with incest in the absence of counseling or professional help. She also testified that the impact on a child who hears her mother and boyfriend talking about the situation and calling her a liar would be immense.

From observance of the witness and from the evidence, the trial court could reasonably conclude that the child's recantation was not credible. Thus, the court did not err by denying the motion for new trial. This point of error is overruled.

The judgment of the trial court is affirmed.

### ON MOTION FOR REHEARING [7]

In our initial opinion, we found that the trial court's refusal to permit evidence of adultery by Mary Driggers was not harmful error because other evidence showed that the parties had contemplated a divorce. Driggers, however, contends that the gist of his defense was not that a divorce was being considered, but that Mary Driggers had a motive for coaching her daughter to make accusations against him. According to Driggers, that motive was that his wife knew that her extramarital affairs [8] could be used against her on the issue of who would get custody of the daughter, and therefore she wanted to use the accusation against him to offset any fault on her part for having the affairs.

On rehearing, counsel also points out that this defensive theory goes not only to the impeachment of Mary Driggers as a witness, but also to the explanation of why the claims were being made against Driggers by the daughter. In other words, Driggers contends this would have been admissible evidence even if Mary Driggers had not testified because it would go to the heart of his defense. Thus, the excluded evidence of the extramarital affairs would go not only to impeach Mary Driggers as a witness, but to cast doubt upon the credibility of the entire case against Driggers.

 Although Driggers raises this on rehearing, if this was the gist of his defense it should have been raised specifically at the trial court level. It was not. He asked that this evidence be admitted, but did not inform the trial judge of the basis now raised. In order to preserve this error, the purpose now asserted should have been specifically set forth at the trial court level. Tex.R.Crim. Evid. 103(a) allows such an offer of proof even without specifying the basis in the trial court when it is apparent from the context within which the questions are asked.

In the present case, in the trial court, there was no evidence or argument that the mother was concerned about seeking custody of the child if a divorce were filed; there was no evidence or argument that the wife was motivated to coach the child to report sexual molestation by the father to assure future custody of the child if a divorce were filed; there was no evidence or argument that the wife was seeking a basis for obtaining custody to offset previous affairs if a divorce were filed. So, from the context, this reason for admitting the evidence was not readily apparent.

We overrule Wilburn Driggers' motion for rehearing.

---

7. Justice Larry Starr was a member of the Court when the original opinion in this cause was issued. .Justice Donald R. Ross succeeded Justice Starr and was a member of the Court at rehearing.

8. In a bill of exceptions made outside the presence of the jury, the trial court allowed a record to be made by questioning Mrs. Driggers about the extramarital affairs. She unequivocally admits to extramarital affairs.