**Jackie Russell KEETER, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 10-00-169-CR.**

Court of Appeals of Texas,
Waco.

April 4, 2001.

Rehearing Overruled May 2, 2001.

■■■

---

Sandy S. Gately, Gatesville, for appellant.

B.J. Shepherd, Hamilton County Dist. Atty., Martin L. Peterson, Hamilton County Asst. Dist. Atty., Hamilton, for appellee.

Before Chief Justice DAVIS, Justice VANCE, and Justice GRAY.

## OPINION

VANCE, Justice.

Jackie Russell Keeter was convicted of indecency with an eight-year-old child. The primary evidence against him was the trial testimony of the child and an outcry

statement she made to a woman she had just met. Keeter was sentenced to life.

Shortly after trial, the child recanted. Also, the child's father and stepmother disclosed they had both told the prosecutor before trial they did not believe the child was telling the truth. After a hearing, the trial court denied a new trial, finding the recantation was not credible.

Finding the trial court abused its discretion in denying the motion for new trial, we will reverse the judgment and remand the cause.

## BACKGROUND

For seven years Keeter had been living with Eva. In May of 1998 when the alleged crime occurred, Keeter, age twenty-nine, and Eva lived in a small two-bedroom house with Keeter's father (Jack), Eva's eight-year-old daughter J.K. (the alleged victim), the three small children of Eva and Keeter, ages three to a newborn, and a live-in babysitter, Vennie. J.K. had lived with Keeter and Eva for three years. J.K.'s biological father, Travis, lived in another county with his fiancee, Rhonda.

The following facts are undisputed. Travis and Rhonda arrived unannounced at Keeter's home on May 21, 1998, and asked if J.K. could come to their home for a summer visit. Travis had not seen J.K. in two years, and Rhonda had never met J.K. Eva was not home, but Keeter let Travis and Rhonda take J.K. for something to eat. At the restaurant, while Travis was getting the food, J.K. told Rhonda that Keeter had been molesting her, and the latest incident had occurred the day before, i.e., May 20.[1] Rhonda told Travis, and the three went to Children's Protective Services (CPS), which brought

in the Sheriff's Department. J.K. and Rhonda were interviewed by Sheriff's Investigator Buster and CPS, and J.K. continued to accuse Keeter. J.K. was taken into custody by CPS, which turned her over to Travis and Rhonda with whom she lived for the next two years while the trial was pending.

Keeter was indicted about a month after the events of May 21 on two counts, aggravated sexual assault and indecency with a child, both offenses pertaining to the alleged molestation on May 20. The indictment also contained an enhancement paragraph because Keeter had been convicted in 1988 of indecency with a child. This increased the punishment range to five to ninety-nine years, or life.

## THE TRIAL

The trial lasted one day, April 10, 2000. The testimony for the guilt-innocence phase occupies seventy-five pages of the record.

### Guilt–Innocence

The State called J.K., Rhonda, and Investigator Buster. J.K., by then age ten, testified that Keeter had been molesting her for a long time, "almost every day," although she could not remember when it started. Among other things, she accused Keeter of "put[ting] his private into my private," although she said she never saw his private parts. She "screamed" during the incidents of molestation because it hurt. Keeter warned her not to tell Eva, and she obeyed because she was afraid of him. The incidents would usually occur in the afternoons. She would be alone in the house with Keeter; Eva would be job hunting, the other children would be in day-care, and Keeter would send anyone

---

1. This was an "outcry statement" under Tex. Code Crim.Proc.Ann . art. 38.072 (Vernon Supp.2001).

else out on errands. The last incident occurred on the day before Travis and Rhonda came, which would make the most recent molestation May 20, the day of the offenses alleged in the indictment. J.K. testified this molestation occurred in the morning.

Rhonda testified about the events of May 21, 1998. She did not know J.K. until this visit. She described the outcry statement at the restaurant, and testified that J.K. "said he touched her, that he made her touch him."

Investigator Buster testified he interviewed J.K. and Rhonda on May 21. CPS representatives were also present and made a videotape. The videotape was not introduced at trial or its contents described. Buster took J.K. to the hospital for an examination. The results of the examination were not introduced at trial, and no medical personnel testified. Buster admitted on cross-examination he learned during his investigation that J.K. "did not recognize male genitalia." Finally, during a series of two questions by the State, Buster testified:

Q: [T]welve days or thirteen days it took you to locate [Keeter]?

A: Something another like that, yes, sir.

Q: Okay. Where did your investigation go from there?

A: Well, I offered Mr. Keeter a polygraph. He said he would take a polygraph— [2]

. . .

Q: Then after—without going into what you just went into, what—what happened after that?

A: Mr. Keeter was taken into federal custody—

Timely objections to these two highly prejudicial statements were sustained, but a motion for a mistrial was denied.[3]

The defense called Eva, Vennie, and Jack, Keeter's father. Eva testified about May 20, the date of the offenses in the indictment, which J.K. said occurred in the morning. Eva said May 20 was the last day of school, and J.K. had a half-day of school in the morning. In the afternoon, Eva took J.K. to a party at a playmate's house. Keeter was home that day, sick in bed. Eva also described the living conditions in the house. There were two bedrooms, one occupied by Eva and Keeter, and the other by Jack. Vennie-the live-in babysitter-and the four children slept in the living room. When Eva was not at home, Vennie kept the children; Eva did not have the children in day-care. Eva testified Keeter worked from 6 a.m. to sometimes 6 to 8 p.m. He had been working these hours for about a year. She said J.K. and Keeter got along well, and J.K. was not afraid of Keeter. Also, Eva and J.K. got along well, and J.K. never mentioned to Eva any problems concerning Keeter.

Vennie, age thirty-three, was the live-in babysitter. Because she had no friends in town and her relatives lived elsewhere, she was at the house with the children practically twenty-four hours a day, seven days a week. She confirmed that J.K. was in school the morning of May 20, and Keeter was at home, sick. Vennie testified that Keeter usually worked until 7 or 8 p.m. He never kept the children, even on weekends; she did. Only she and Eva disciplined the children. She testified that J.K. had a good relationship with Keeter and was not afraid of him. Vennie believed

---

2. The record does not show if a polygraph was ever taken.

3. Keeter does not raise on appeal the denial of this motion.

J.K. would have told her about any problem with Keeter.

Jack also confirmed that J.K. went to school the morning of the 20th. She got out at noon and went to a party at a friend's. Keeter was at home, sick; Jack was off work and was also at home. He stated that J.K. confided her problems in him, was not afraid of Keeter, and was never disciplined by Keeter. He confirmed that Keeter worked 6 a.m. to 6 p.m., five to six days per week.

The jury found Keeter guilty, but only of the offense of indecency with a child. Although it was late in the day, without a break, the trial immediately proceeded to the punishment phase. The testimony and introduction of documentary evidence for the punishment phase occupy less than fifteen pages of the record.

### Punishment

The State called one witness, Keeter's sister, who testified that when she was between the ages of seven and twelve, and Keeter was between the ages of eleven and sixteen, he molested her on several occasions, although they never had sexual intercourse. She did not tell anyone until thirteen years later, when she told her husband after learning Keeter had been indicted on the offenses involving J.K.

The State also introduced documentary evidence of the following:

- In 1987 when he was seventeen, Keeter was accused of exposing his genitals in the presence of a female under the age of seventeen. He was convicted of indecency with a child in 1988, and placed on probation. That was revoked in 1989 because he allegedly had sexual intercourse with another female under the age of seventeen. He was sentenced to two years imprisonment. Further details about these incidents were not brought out at trial.

- In July of 1998, Keeter was convicted in federal court of being a felon in possession of a firearm. He was sentenced to thirty months' imprisonment. (Keeter was actually an inmate assigned to a federal prison during the time of trial on April 10, 2000.)

Eva testified briefly and made a plea for leniency, because she did not "feel that [Keeter] should be taken away from the other three children for a long time. He needs to watch them grow up sometime . . . ."

The jury assessed a sentence of life in prison. After a six minute break, the court reconvened at 6:01 p.m. and imposed the sentence.

### THE MOTION FOR NEW TRIAL

Several weeks after trial, Travis brought J.K. to Eva's. J.K. was being unmanageable, and Rhonda and J.K. did not get along. Later that day, J.K. approached Eva and said she had made up all the allegations about Keeter molesting her. Eva took J.K. to Keeter's defense attorney, who obtained a signed affidavit of recantation from J.K. Later, Travis and Rhonda both told the attorney they did not believe J.K.'s allegations against Keeter and had both told the prosecutor before trial about their doubts. The attorney filed a motion for a new trial, which was heard on May 30, 2000. Keeter presented evidence about the recantation, and also about the State's failure to disclose exculpatory information, i.e., that Travis and Rhonda had told the State they did not believe J.K.

At the hearing, the defense called Eva to describe the recantation. Eva had not spoken with Travis or J.K. since the trial on April 10. Eva said Travis had called

her and stated he wanted to bring J.K. to stay with Eva for the summer because "he was tired of her lying." Travis and J.K. arrived about 4 a.m., and J.K. fell asleep on the sofa. Later, Eva went to work, and when she got home from work J.K. asked to talk to her.[4] J.K. told Eva "I lied.... I wanted to go stay with daddy [for the summer of 1998] and you wouldn't let me." Eva took J.K. to Keeter's lawyer, who among other things advised her to go to CPS. However, CPS refused to reopen its investigation. On cross-examination, Eva denied telling J.K. that Eva could not make it financially without Keeter. Eva said even though Travis was not paying his child support, she was working and made enough money to pay the bills.

Travis testified next. He said that in 1998, he wrote Eva that he wanted J.K. to come visit him for the summer. So, even though he showed up unannounced on May 21, 1998, his arrival was not a complete surprise. He testified he did not believe J.K. told the truth about Keeter. Furthermore, he said about J.K.: "[A]ll she has told me through the year was a lie. She has not told me one thing truthful." Travis also testified he told the prosecutor before trial he did not believe J.K. However, he admitted on cross-examination that prior to that, he had told the prosecutor he believed J.K. Travis also confirmed that J.K. accused Jack during the trial of making some threatening comments to J.K.

The defense called Rhonda, who also stated she did not believe J.K.'s accusations about Keeter, never believed J.K. from the beginning, and told the prosecutor that before trial. Rhonda said "[J.K.] kept changing her story one too many times" about whether Keeter molested her. "She will say he did it, then if we asked-talked about it, she'll say he didn't do it or I never said that. She just wasn't consistent with her story." Rhonda admitted she had a poor relationship with J.K. She said: "I was not going to tolerate her lying, being dishonest, being disrespectful to other people.... I told [Travis] he either gets her under control to where she minds and listens, not throw fits, and hits me, be mean to me or she can go back home to her mother." Rhonda said she and Travis, at CPS's instruction, had tried taking J.K. to counseling three or four times, but J.K. did not want to go. Finally, when asked "Was your experience with [J.K.] that she lies?", Rhonda responded: "She lies a lot."

Finally, the defense attorney testified briefly that the State had never told her that Travis and Rhonda did not believe J.K. about the molestation.

The State called J.K. to testify. J.K. said she did not tell the truth at trial about Keeter. The State asked: "What did you not tell us the truth about?" J.K. responded: "About the whole thing." She explained why she made up the story:

A: Because I could live with my dad.

Q: Well, had your mother said you couldn't go?

A: She said I couldn't go because it was her—it was her summer and I didn't know [sic].

J.K. said she got ideas for her story about Keeter from things her eleven-year-old best friend, E., told her. E. told J.K. about how her stepfather physically abused her mother. E. said he "hurt her mom," "did naughty things to her," "tried to suffocate her," "locked her up in the

---

4. Eva's testimony was: "And she got to the house about four o'clock in the morning and she had fell asleep on the couch, and me and Travis sat there, talked about her staying with me for the summer. The next day when I got home from work she told me she needed to talk to me, so I sat her down on the couch...."

bathroom," and "let her ... scream." J.K. intended to tell the truth when she returned home from the summer with Travis. However, by that time she was afraid she would get into trouble if she told the truth. J.K. denied telling Investigator Buster in an interview prior to the hearing that she changed her story because Eva told her Eva could not make a living without Keeter. J.K. said she told Buster "that my mom said that she needed help and I had to help her out," with for example doing the dishes or cleaning her room. She also denied telling Buster that it was her three-year-old stepsister who suggested the plan about accusing Keeter of something. J.K. said her stepsister told her that J.K. "could go with [Travis] if something happened." J.K. did admit that Jack threatened her at trial to take her daddy away, and had been mean to her until recently after she changed her story.

The State also called Investigator Buster. Prior to the hearing on the motion, he and CPS worker Johnson went to J.K.'s school and interviewed her. Buster attempted to impeach J.K.'s testimony by stating that J.K. told him during this interview: (1) she changed her story because Eva was having a hard time making a living without Keeter and "she" missed Keeter, and (2) her three-year-old stepsister suggested to her the plan to accuse Keeter. He did confirm that J.K. said she made up the story so she could spend the summer with Travis. He also admitted J.K. said something about an older girl telling J.K. "what grown people do or something to that effect."

CPS worker Johnson also testified and confirmed the substance of Buster's testimony that J.K. said she changed her story because Eva was having a hard time making it without Keeter and "she" missed Keeter, and that J.K.'s stepsister suggested to her the idea to accuse Keeter.

Two weeks later the judge denied the motion by a letter order. It said: "I don't find the new testimony that recants the trial testimony to be credible. To do so would require me to believe that this young child made up her testimony because her (younger!!!) sister told her she would have to make something up about the defendant so she could get to go and spend the summer with her dad, when she did not previously know her dad was coming and when she had not seen him in two years." The judge did not address the issue of whether the prosecution withheld exculpatory evidence from the defense. That issue is either arguably included in the judge's letter which stated "Accordingly the motion for new trial is denied and IT IS SO ORDERED," or the issue is deemed denied. Tex.R.App.P. 21.8(c).

## THE RECANTATION ISSUE

### *The Legal Standard*

Motions for new trial based on newly discovered evidence, including recanted testimony, are governed by Tex. Code Crim. Proc.Ann. art. 40.001 (Vernon Supp.2001). *Ashcraft v. State,* 918 S.W.2d 648, 652–53 (Tex.App.—Waco 1996, pet. ref'd); *Driggers v. State,* 940 S.W.2d 699, 708 (Tex.App.—Texarkana 1997, pet. ref'd); *Monse v. State,* 990 S.W.2d 315, 317 (Tex.App.—Corpus Christi 1999, pet. ref'd). It states: "A new trial shall be granted an accused where material evidence favorable to the accused has been discovered since trial." The standard of review for the denial of a motion for a new trial is abuse of discretion, *i.e.,* whether the denial was arbitrary or unreasonable. *Ashcraft,* 918 S.W.2d at 652. The trial court is arbitrary or unreasonable in denying the motion if the record reflects: (1) the newly discovered evidence was unknown to the movant at the time of trial; (2) the movant's failure to discover the

evidence was not due to his want of diligence; (3) the evidence is admissible and not merely cumulative, corroborative, collateral, or impeaching; and (4) the evidence is probably true and would probably bring about a different result in another trial. *Moore v. State,* 882 S.W.2d 844, 849 (Tex.Crim.App.1994); *Ashcraft,* 918 S.W.2d at 653. "[I]n cases 'where a witness has testified to material inculpatory facts against an accused and after verdict, and before motion for new trial has been acted on, such witness makes affidavit that he testified falsely,' the general rule is that the new evidence is probably true and a new trial should be granted." *Id.* (quoting *Williams v. State,* 375 S.W.2d 449, 451 (Tex.Crim.App.1964)). An exception to the general rule occurs when the trial court finds the recantation to not be credible based on the trial evidence and the evidence at a hearing on the motion. *Id.; Driggers,* 940 S.W.2d at 709; *Monse,* 990 S.W.2d at 318. "Credibility" is measured by whether the recantation is "probably true." *Ashcraft,* 918 S.W.2d at 653; *Driggers,* 940 S.W.2d at 709.

### Application

We begin our analysis by reviewing the state of the evidence in cases in which the finding of an incredible recantation and the denial of a new trial was found not to be an abuse of discretion.

In *Ashcraft,* the trial court evaluated the trial evidence about whether the abuse happened as well as the evidence at the hearing on the motion for new trial. *Ashcraft,* 918 S.W.2d at 654. The evidence at trial was that the child, who was twelve at the time of the abuse, made an outcry statement to her school counselor who had eleven years of experience, made another statement to a doctor who examined her, and was found during the doctor's examination to have a torn hymen and blunt-

force penetrating trauma. *Id.* The evidence at the hearing was that the child disliked foster care and wanted to return home, was being pressured by her mother—who never believed her—during weekend visits to recant, and had been led to believe that if she recanted she could go to England to live with her aunt and sister. *Id.* On the day the child signed the recanting affidavit, her mother took her unexpectedly to the defense attorney's office where she was told her father could get a life sentence for the crime. *Id.* Then her mother took her to the District Clerk's office where she was shown the photograph of her vagina which was used at trial, of which she was previously unaware, and the child became angry and ashamed. *Id.* Finally, her mother took her back to the defense attorney's office where she signed the affidavit. *Id.* The child testified at the hearing on the motion that she lied about the abuse because she was angry with her father for not protecting her from sexual assault by intercourse six or seven years earlier by the seven-year-old younger brother of the babysitter. *Id.* However, the doctor who examined her testified the vaginal injuries he found could not reasonably have been caused by a seven-year-old. *Id.*

In *Driggers,* the trial court heard testimony from the child (age six at the time of the abuse) at the hearing on the motion for new trial that she lied because her father gave her a hard whipping and she was angry. *Driggers,* 940 S.W.2d at 709. However, the child admitted her grandparents would no longer speak to her, she had been sad over the matter, and her mother's new boyfriend called her a liar. *Id.* A CPS worker testified that the mother could not remember the circumstances of the first recanting, that the child told the worker she could not remember whether anyone told her what to say in her recantation, and that the child's spontaneous an-

swers during her original interview were markedly different from her reflective, hesitant answers during her recantation interview. *Id.* Finally, a counselor testified that a young child has extreme difficulty dealing with incest without the help of counseling (the child's mother never took her to counseling after the incident), and that the impact of the child's mother's boyfriend calling her a liar would be immense. *Id.*

In *Monse,* the defendant pled guilty and signed a judicial confession after being shown statements by the child and her mother about the abuse. *Monse,* 990 S.W.2d at 317. The child and her mother recanted, after which the defendant said for the first time that he was drunk when the alleged abuse occurred, could not remember what happened, and simply took the child's word that he had abused her. *Id.* The motion for new trial was based solely on the filed recanting affidavits of the child and her mother. *Id.* The child's affidavit stated she lied so she could move out and live with her grandparents or biological father. *Id.* The mother's affidavit stated the child did not make the outcry statement to her, and that the child's grandparents had admitted coaching the child to lie about the abuse. *Id.* However, part of the child's original statement was that her mother initially told her not to tell her grandparents about the abuse because CPS would get involved and the defendant would have to move out. *Id.* This coupled with the defendant's signed confession and his failure to previously mention he was drunk and did not remember what had happened supported the denial of the motion.

The state of the evidence before the trial court in Keeter's case, and the trial court's analysis of that evidence, does not compare favorably with these three cases. The judge said he did not believe the recanting because: (1) it was not credible J.K. made up the story in preparation for an unexpected visit by Travis whom she had not seen in two years, and (2) he did not believe J.K.'s three-year-old stepsister could devise the idea to accuse Keeter of something. But that is not precisely the evidence at the hearing on the motion.

Travis testified he wrote Eva he wanted J.K. to come visit for the summer. J.K. testified she had discussed that with Eva, and Eva said "no." Therefore, the motive for J.K. to concoct an abuse story was proven. The exact manner in which J.K. would convey the story to Travis need not have been anticipated by her. The unexpected arrival of Travis and Rhonda, while fortuitous, was not the only manner or method for J.K. to convey the abuse accusation to Travis. As for whose idea it was to accuse Keeter of something, J.K. testified she got ideas from listening to her eleven-year-old friend, E., who had witnessed first-hand the physical abuse of her mother. Investigator Buster and the CPS worker attempted to contradict that, and claimed J.K. told them during an interview at her school that J.K.'s three-year-old stepsister came up with the suggestion to accuse Keeter of something. However, Buster admitted J.K. said something about an older girl telling J.K. "what grown people do or something to that effect." J.K. also denied she got her idea from her stepsister. All her stepsister said was she "could go with [Travis] if something happened." [5]

**5.** Investigator Buster and the CPS worker also attempted to undermine J.K.'s recantation by testifying that J.K. said during the interview she recanted because Eva told her

Eva could not make it without Keeter. However, the judge did not include this with his reasons for not believing J.K., and J.K. specifically denied she made such a statement, in-

In addition, the trial court either failed to consider or gave insufficient weight to: (1) the weaknesses in the evidence that the abuse occurred, and (2) the improbability that the recantation was for any reason other than that it was true.

The trial evidence along with the testimony at the hearing on the motion for new trial cast substantial doubt on J.K.'s accusations of abuse by Keeter.

- J.K. testified the last incident was on the morning of the day before Travis came, which would have been May 20. However, it was uncontroverted she was in school that morning, and went to a party that afternoon.

- J.K. testified Keeter abused her "almost every day" and she "screamed" because it hurt. None of the other three adults living in the house, or J.K.'s three-year-old stepsister, saw this daily abuse or heard her scream. Vennie, the babysitter, who was home constantly and slept in the living room with all four children, never saw or heard anything.

- J.K. testified the abuse usually occurred in the afternoons. However, it was uncontroverted that Keeter worked until at least 6 p.m. five to six days per week.

- J.K. testified Keeter "put his private into my private," but according to Investigator Buster, he learned in his investigation that J.K. "did not recognize male genitalia."

- Although J.K. was examined by a doctor the day after the alleged abuse, and a report prepared, no medical evidence was presented at trial.

- There was no testimony that J.K. was upset on May 21 about anything that happened on May 20.

Other evidence supports the belief that J.K.'s recantation was truthful.

- The State argues that J.K. recanted because Eva told her Eva could not make it financially without Keeter. However, Eva had no contact with J.K. from the time of trial until Travis brought J.K. back at 4 a.m. J.K. fell asleep, and later Eva went to work. J.K. recanted when Eva got home from work. There was insufficient opportunity for Eva to pressure J.K. to recant.

- J.K. recanted after being returned to Eva by Travis. If the reason J.K. made up accusations against Keeter was to live with Travis, it is logical that once that ended, J.K. would tell the truth.

- Rhonda testified at the hearing that J.K. was recanting even before trial.

- J.K. said she would scream when the abuse happened. At the hearing on the motion, she said she got the idea to accuse Keeter from what her friend E. told her, which included the fact that E.'s stepfather made E.'s mother scream.

Based on the evidence both at trial and the hearing, we find that the evidence does not support the trial court's finding that J.K.'s recantation was not credible. Therefore, the trial court abused its discretion in denying the motion for new trial. Keeter's issue is sustained.

## THE *BRADY* ISSUE

Because we sustain the recantation issue, we need not decide Keeter's issue under *Brady v. Maryland,* that the prosecutor failed to inform defense counsel about what Travis and Rhonda told him regarding whether J.K. was telling the

stead testifying she told Buster that Eva told J.K. she needed to help around the house.

truth. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *see United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (*Brady* extends to evidence which impeaches the credibility of a witness). However, we note that if the defense lawyer had known that Travis and Rhonda had potential impeachment evidence, and had interviewed them and learned their opinions of J.K.'s untruthfulness, both could have been called to testify at the original trial to impeach J.K.'s character for truthfulness. TEX.R.EVID. 608(a)(1). Rhonda could have testified that J.K. vacillated on whether the abuse even occurred. Both Travis and Rhonda could have testified regarding their opinion that J.K. was not a truthful person. When an entire case revolves around the credibility of a single witness, and the defendant can testify only at the peril of the jury being informed of his two prior felony convictions, one of which is for the same type of offense, no evidence is more important to the defense than testimony which impeaches the credibility of that single witness.

## CONCLUSION

Finding that the trial court abused its discretion in denying the motion, we reverse the judgment, and remand the cause for a new trial.

Justice GRAY dissenting.

GRAY, Justice, dissenting.

The relationship between the victim and her step-mother over the two years between the victim's outcry of sexual assault and the time of trial had apparently not been particularly good. Within days after the trial, the victim's step-mother told the victim's father that either the victim must leave their home or the step-mother would. The eight year old victim, now ten, chose to return to live with her mother, the household in which she had been assaulted. Keeter was not living there at the time she returned to live with her mother.

On the day the victim returned to her mother's house, she told her mother that she had lied about what Keeter, her step-father, had done to her. After she said that she had lied about what Keeter had done, Keeter's father, who had lived with the victim at the time of the assault, was nice to her. Keeter's father had been told to leave the court-house during the trial because he threatened to take the victim's father away from her, just like she had taken Keeter away from his children, the victim's half-siblings.

The trial judge, who observed all the witnesses during trial, was presented with this and other testimony in determining if the recantation of the victim's statement was credible. The trial court determined that the recantation was not credible. Finding no abuse of discretion in that determination, I would affirm the trial court's denial of the motion for new trial. Because the majority does not, I respectfully dissent.